United States District Court
Middle District of Florida
Jacksonville Division

**CHROME HEARTS, LLC,**

    *Plaintiff,*

v.                                                              **NO. 3:22-cv-729-TJC-PDB**

**PINKCOBOUTIQUE, LLC, ETC.,**

    *Defendants.*

---

# Report and Recommendation

In this trademark infringement action, Chrome Hearts, LLC, obtained defaults against Pinkcoboutique, LLC, Qu'Knhiya Hill, and Qu'Aneisha Hill, D25, D26, D28, dismissed the claims against Qu'Aneisha Hill, D34, and now moves for default judgment for $100,000 in statutory damages and a permanent injunction against Pinkcoboutique and Qu'Knhiya Hill, D31.

## I.    Procedural History

Chrome Hearts originally sued the defendants in the Central District of California. *See Chrome Hearts, LLC v. Pinkcoboutique, LLC, et al.*, 2:22-cv-00067-PA-AFM (C.D. Cal.). That court dismissed the case for lack of prosecution, failure to comply with a court order, and failure to comply with the Federal Rules of Civil Procedure. *See id.* D21 (March 16, 2022, "Minute Order in Chambers").

Chrome Hearts later sued the defendants here, D1, and filed returns of service of process against them, D15–17. In affidavits, a process server states

he served Pinkcoboutique by handing the summons and complaint to Qu'Knhiya Hill as a corporate officer, served Qu'Knhiya Hill by handing the summons and complaint to her, and verified from her she is not in active military service. D15, D17.

Qu'Knhiya filed what she titled "Answer":

Dear Chrome Hearts,

Please accept our unfeigned apologies for IP/trademark infringement.

We provided everything that you all asked for in the previous case in California including vendors information, monetary, removed all products and stopped the sales. We complied with your team.

We ask for grace with this case, if any peaceful solution you can contact us at qhillk@yahoo.com.

D18.[1]

Chrome Hearts moved for default against Pinkcoboutique and Qu'Aneisha Hill, D19, and unilaterally filed a case management report for the

---

[1]"In responding to a pleading, a party must … state in short and plain terms its defenses to each claim asserted against it; and … admit or deny the allegations asserted against it by an opposing party." Fed. R. Civ. P. 8(b)(1). Through her answer, Qu'Knhiya Hill does not admit or deny each allegation but appears to admit infringement.

"Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required." Fed. R. Civ. P. 12(b). A party may assert by motion the defense of personal jurisdiction and insufficient service of process. Fed. R. Civ. P. 12(b)(2) & (5). "A motion asserting [either defense] must be made before pleading if a responsive pleading is allowed." Fed. R. Civ. P. 12(b). A party waives the defense of lack of personal jurisdiction or insufficient service of process by failing to "make it by motion" or "include it in a responsive pleading." Fed. R. Civ. P. 12(h)(1)(B). Here, by failing to raise the defenses, *see generally* D18, Qu'Knhiya Hill has waived them. Regardless, they appear unavailable to her on the merits because she resides in Florida, D1 ¶7, and the process server handed her the summons and complaint, D17.

claims against Qu'Knhiya Hill, explaining Qu'Knhiya Hill had failed to respond to efforts to schedule a case management conference, D21 at 1.

After waiting to determine if the parties would informally settle, the Court ordered Chrome Hearts to advise the Court about the status of the litigation and permitted any defendant to respond. D22. Chrome Hearts responded it wanted to pursue default against all three defendants or at least against Pinkcoboutique and Qu'Aneisha Hill. D23 at 1. Chrome Hearts represented that Qu'Knhiya Hill had not responded to three attempts to discuss settlement. D23 at 2. Chrome Hearts detailed continuing trademark infringement, explaining that around December 11, 2022, which was after Qu'Knhiya Hill had responded to the complaint through her letter, a Pinkcoboutique customer reported to Chrome Hearts that the customer had encountered counterfeit Chrome Hearts items at Pinkcoboutique and believed she "was a victim of that indecency." D23 at 1–2.

The Court granted the motion for default against Pinkcoboutique and Qu'Aneisha Hill, directed Qu'Knhiya Hill to inform the Court whether she intends to defend herself, and directed Chrome Hearts to email a copy of the order to the defendants.[2] D24 ¶¶1, 2, 4. The Court warned Qu'Knhiya Hill that if she failed to timely respond, default would be entered against her, likely

---

[2]An unincorporated association may be served by delivering a copy of the summons and of the complaint to an officer or managing or general agent. Fed. R. Civ. P. 4(h)(1)(B). "Serving a summons … establishes personal jurisdiction over a defendant … who is subject to the jurisdiction of a court of general jurisdiction in the state where the district is located[.]" Fed. R. Civ. P. 4(k)(1)(A).

A 2022 annual report of Pinkcoboutique identifies the company as a Florida limited liability company and Qu'Knhiya Hill as its manager. D31-4. As the Court implicitly determined in directing default against Pinkcoboutique, D24 ¶1, Chrome Hearts properly served process on Pinkcoboutique when the process server handed the summons and complaint to Qu'Knhiya Hill, D15.

followed by default judgment. D24 ¶2. The clerk entered defaults against Pinkcoboutique and Qu'Aneisha Hill. D25, D26. Qu'Knhiya Hill failed to respond to the order, the Court ordered the clerk to enter default against her, D27, and the clerk entered default against her too, D28.

Chrome Hearts timely moved for default judgment. D29; *see* D24 (establishing a deadline), D27 (same). The Court struck the motion for failure to comply with the Local Rules, D30, and Chrome Hearts timely filed the current motion for default judgment, D31; *see* D30 (establishing a deadline). With the motion, D31, Chrome Hearts provides a declaration of counsel, D31-1, trademark registrations, D31-2; photographs evidencing infringement, D31-3; an annual report for Pinkcoboutique, D31-4; and a process server's affidavit concerning service of process on Qu'Aneisha Hill, D31-5.

In the declaration, counsel for Chrome Hearts verifies the validity of the registrations, D31-1 ¶2, and the annual report, D31-1 ¶8, details service of process, D31-1 ¶11, and attempts to determine military service, D31-1 ¶7, and states:

> In approximately October 2021, my office discovered that Defendants were offering for sale and/or selling the Accused Products … on their website, www.pinkcoboutique.com and Instagram (@pinkco.boutique). My office purchased two of the Accused Products and verified with Chrome Hearts that they contain inauthentic marks and are not legitimate Chrome Hearts products. My office also provided photographs of the remaining Accused Products to Chrome Hearts who again confirmed that they contained inauthentic marks and are not legitimate Chrome Hearts products. …
>
> On January 5, 2022, Plaintiff filed a Complaint against Defendants in the Central District of California, alleging the same claims of trademark infringement that are asserted in the instant action. Defendants retained counsel to assist them with their defense in the California action. I participated in settlement discussions with Defendants' counsel, who represented that Defendants made approximately $1,700

4

in revenue. Defendants' counsel provided sales records for the Accused Products which only spanned from July to December 2021 and represented approximately $1,000 in revenue.

In March 2022, I discovered that Defendants were continuing to offer for sale and/or sell the Accused Products on their website. In particular, Defendants blurred out or covered up an infringing mark at issue on an Accused Product called "Holy Grail Jeans" while the Parties were actively litigating the California action.

In March 2022, I sent Defendants' counsel a confidential settlement demand letter detailing the infringement and Defendants' willful conduct, including pictures of the Accused Products shown in the operative complaint in this action as well as evidence gathered throughout the course of litigation. The Parties were unable to settle. Due to a procedural issue, the case was dismissed without prejudice in the California action and thus my office refiled the action in this Court on July 1, 2022. …

…

On or about December 11, 2022, I was informed by my client that one of Defendants' customers reported to Chrome Hearts that she had come across counterfeit Chrome Hearts items at Defendants' store, reporting that she "was a victim of that indecency."

On August 24, 2023, in response to the Court's Order filed on July 25, 2023 (ECF No. 22), I began discussing Plaintiff's intended plans to litigate and explored potential settlement with defendant Qu'Knhiya Hill. I also notified Ms. Hill of the Court's Order filed on August 23, 2023 (ECF No. 24) which directed her to respond to the Order by September 15, 2023 that she would litigate the matter or a default would otherwise be taken. Although Ms. Hill and I had further discussions into September regarding potential settlement, the Parties were unable to reach an agreement and I informed Ms. Hill that Plaintiff would be proceeding with its default judgment Motion. Ms. Hill never filed a response to the Court's Order at ECF No. 24 as ordered and did not communicate with me further after September 15, 2023.

D31-1 ¶¶3–6, 9, 10.

The Court ordered Chrome Hearts to supplement the motion to explain how service of process against Qu'Aneisha Hill was proper or request dismissal

of the claims against her. D32. Chrome Hearts notified the Court it was dismissing the claims against her without prejudice, D34, and the Court ordered the claims against her dismissed without prejudice, D35.

## II.    Complaint

### A.    Allegations

Chrome Hearts is a Delaware limited liability company with its principal place of business in Los Angeles, California. D1 ¶5. Pinkcoboutique is a Florida limited liability company with a principal place of business in Jacksonville, Florida. D1 ¶6. Qu'Knhiya and Qu'Aneisha Hill are persons residing in Jacksonville and are Pinkcoboutique's owners, officers, directors, "and/or" managing agents. D1 ¶¶7, 8.

Since 1988, Chrome Hearts has designed, manufactured, and sold artistically styled leather goods, clothing, jewelry, and accessories. D1 ¶10. Chrome Hearts sells various quality artistic products, including leather clothing, sterling-silver jewelry, belt buckles, fabric clothing, bags, and a collection of other products, including furniture, eyewear, and crystal. D1 ¶11. Chrome Hearts' leather products "are adorned with sterling silver hardware, including all the buttons and ornamental pieces." D1 ¶13. Chrome Hearts is known for using suede-inlay designs with leather clothing and for combining the look of rugged clothing with fashion attire. D1 ¶13. Almost all Chrome Hearts products are handmade in Los Angeles by Chrome Hearts' craftsmen who have workmanship expertise conforming to strict standards. D1 ¶16. Chrome Hearts products are sold in Chrome Hearts stores throughout the world, on Chrome Hearts' official website, and in select specialty stores. D1 ¶12. Entertainers, including Madonna, Arnold Schwarzenegger, Rihanna,

Cher, Kate Hudson, Tom Brady, David Beckham, and Lenny Kravitz, have been seen wearing Chrome Hearts. D1 ¶14. "In 1993, the Council of Fashion Designers of America … presented Chrome Hearts with an unsolicited award as designer of the year for its innovative accessories and jewelry designs." D1 ¶15.

Chrome Hearts owns the CHROME HEARTS word mark, various design-only marks, and composite trademarks "comprising the CHROME HEARTS mark and design components," D1 ¶18, including these marks registered with the United States Patent and Trademark Office:

| Chrome Hearts' Mark | U.S. Reg. No. | Goods/Services |
|---|---|---|
| **CHROME HEARTS** | 1,665,791 | 025: Men's and Women's Clothing, Namely, Pants, Shirts, Tee Shirts, Sweaters, Jackets, Vests, Chaps, Skirts, Belts, Underwear, Gloves, Shoes and Boots. |
|  | 3,546,039 | 025: Clothing, namely, tee shirts, shirts, tank tops, sweat shirts, sweat pants, jeans, pants, sweaters, skirts, dresses, jackets, coats, undergarments, hats, socks and footwear |

| Chrome Hearts' Mark | U.S. Reg. No. | Goods/Services |
|---|---|---|
|  | 2,118,026 | 025: Men's and Women's Clothing, Namely, Pants, Shirts, Tee Shirts, Sweaters, Jackets, Vests, Chaps, Skirts, Belts, Underwear, Gloves, Shoes and Boots. |
|  | 2,216,575 | 025: Clothing; namely, tee shirts, shirts, tank tops, pants, chaps jeans, sweaters and jackets. |
|  | 3,542,742 | 025: Clothing, namely, tee shirts, shirts, tank tops, sweat shirts, sweat pants, jeans, pants, sweaters, skirts, dresses, jackets, coats, undergarments, hats, socks and footwear. |
|  | 2,408,082 | 025: Men's and women's clothing; namely, jeans, leather pants, skirts, jackets, chaps, sweaters, vests, tee-shirts and shirts. |

| Chrome Hearts' Mark | U.S. Reg. No. | Goods/Services |
|---|---|---|
|  | 3,385,416 | 025: Clothing, namely, tee shirts, shirts, sweaters, tank tops, sweatshirts, hats and pants. |
|  | 3,388,911 | 025: Clothing, namely, tee shirts, shirts, tank tops, sweatshirts, sweat pants, sweaters and hats. |
|  | 3,606,059 | 025: Clothing; Namely, Shirts, Trousers, Jackets, Vests, Chaps, Men's and Women's Underwear, Coats, Clothing Belts, Gloves and Boots. |
|  | 4,494,945 | 025: Clothing, namely, tee shirts, shirts, tank tops, sweaters, sweat shirts, vests, dresses, skirts, jackets, coats, jeans, leather pants, chaps, undergarments, swimwear, hats and footwear |

| Chrome Hearts' Mark | U.S. Reg. No. | Goods/Services |
|---|---|---|
|  | 3,388,920 | 025: Clothing, namely, tee shirts, shirts, sweatshirts, jackets and pants. |
|  | 4,619,674 | 025: Clothing, namely, tee shirts, shirts, tank tops, sweat shirts, sweat pants, vests, sweaters, jeans, pants, chaps, dresses, skirts, jackets, coats, underwear, swimwear, hats, socks and footwear. |

D1 ¶18.

9

"Chrome Hearts has always devoted substantial time, effort, and money to designing, developing, advertising, promoting, and marketing its products[.]" D1 ¶19. Chrome Hearts spends an average of more than $1 million annually on advertising, promoting, and marketing the Chrome Hearts brand. D1 ¶19. Because of these efforts, "Chrome Hearts has sold over a billion dollars' worth of clothing, all bearing one or more of the Chrome Hearts [m]arks." D1 ¶19.

"Registrations for many of the Chrome Hearts [m]arks, including the … registration[s] identified above, are valid, subsisting, and are incontestable. Through longstanding use, advertising, and registration, the Chrome Hearts [m]arks have achieved a high degree of consumer recognition and constitute famous marks." D1 ¶20. "Chrome Hearts has continuously used the Chrome Hearts [m]arks in interstate commerce in connection with the sale, distribution, promotion, and advertising of its goods since [the marks'] respective dates of first use." D1 ¶21. In the United States and throughout the world, the Chrome Hearts marks identify high-quality leather fashion, jewelry, and accessories designed and manufactured by Chrome Hearts. D1 ¶22. Because of "Chrome Hearts' long use, extensive sales, and significant advertising and promotional activities, the Chrome Hearts [m]arks have achieved widespread acceptance and recognition [among] the consuming public and trade throughout the United States." D1 ¶23.

One or more of the defendants has manufactured, produced, marketed, distributed, advertised, offered for sale, or sold clothing products and accessories that bear counterfeit marks ("Accused Products"). D1 ¶23. The counterfeit marks are "identical to, substantially indistinguishable, and/or

confusingly similar to one or more of the Chrome Hearts [m]arks." D1 ¶23.
Examples include:









D1 at ¶23.

The defendants promoted, marketed, and sold the clothing products and accessories through the website https://pinkcoboutique.com/ and the Instagram accounts @pinkco.boutique and @knhiya. D1 ¶24. The website and Instagram accounts are accessible to consumers throughout the United States, including consumers in the Middle District of Florida. D1 ¶24. Through the Instagram accounts, the defendants directly target consumers, including consumers in the Middle District of Florida, with the Accused Products. D1 ¶25. The defendants offered for sale, sold, and shipped the Accused Products to consumers in the Middle District of Florida.[3] D1 ¶26. Chrome Hearts has not granted the defendants a license or given the defendants permission to use Chrome Hearts' intellectual property, including its marks. D1 ¶28.

Each defendant "knew or reasonably should have known of the wrongful acts and behavior alleged … and the damages caused thereby, ratified, and

---

[3]Chrome Hearts alleges the defendants "engaged in [these] infringing activities with the knowledge that [Chrome Hearts] was a company with its principal place of business located in this judicial district." D1 ¶27. The Court considers this allegation an erroneous holdover from the California litigation; the allegation contrasts with Chrome Hearts' allegation that its principal place of business is in Los Angeles. *See* D1 ¶5.

encouraged such acts and behavior, and/or had a non-delegable duty to prevent such acts and behavior but failed or refused to do so." D1 ¶9. The Accused Products the defendants sold in, and shipped to, the Middle District of Florida are "very likely" to cause confusion for consumers, including Chrome Hearts' customers. D1 ¶29. At the time of initial interest, sale, and post-sale, the consumers are led to believe "the Accused Products are genuine goods originating from, associated with, and/or approved by Chrome Hearts." D1 ¶29. The defendants' acts "have misled and confused and were intended to cause confusion, or to cause mistake, or to deceive as to the origin, affiliation, or association of the Accused Products with Chrome Hearts, and the sponsorship or approval of the Accused Products by Chrome Hearts." D1 ¶30.

## B.  *Claims*

Chrome Hearts brings four claims: trademark counterfeiting and infringement under § 32 of the Lanham Act, 15 U.S.C. § 1114, D1 ¶¶31–42; false designation of origin and false descriptions under § 43(a) the Lanham Act, 15 U.S.C. § 1125(a), D1 ¶¶43–48; trademark infringement under Florida common law, D1 ¶¶49–58; and unfair competition under Florida common law, D1 ¶¶59–68.

## C.  *Demand*

Chrome Hearts "demands a trial by jury of all claims in this litigation," D1 at 25, and relief that includes an "award of statutory damages pursuant to 15 U.S.C. § 1117(c) up to $2 million per trademark counterfeited and infringed," and a permanent injunction "restraining and enjoining Defendants, their officers, agents, employees, and attorneys, and all those persons or entities in active concert or participation with them from":

a. manufacturing, importing, advertising, marketing, promoting, supplying, distributing, offering for sale, or selling Accused Products and/or any other products that bear the Chrome Hearts [m]arks, or any other marks confusingly similar thereto;

b. engaging in any other activity constituting unfair competition with Chrome Hearts, or acts and practices that deceive consumers, the public, and/or trade, including without limitation, the use of designations and design elements associated with Chrome Hearts; [and]

c. committing any other act which falsely represents, or which has the effect of falsely representing that the goods and services of Defendants are licensed by, authorized by, offered by, produced by, sponsored by, or in any other way associated with Chrome Hearts.

D1 at ¶69.[4]

## III.   Law & Analysis

### A.   *Liability*

In the motion for default judgment, Chrome Hearts does not specify the claim or claims for relief on which it wants default judgment but observes all four claims for relief depend on the same likelihood-of-confusion analysis. D31 at 10–11. The request for statutory damages is based only on federal law. *See* D1 ¶¶42, 48, 69(F); D31 at 14–18.

"When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a). "If

---

[4]Chrome Hearts demands additional relief in the complaint that Chrome Hearts does not request in the motion for default judgment, including ordering recall of the Accused Products and directing the defendants to disclose their suppliers and manufacturers, to file and serve a sworn report detailing compliance with the injunction, and to provide an accounting. D1 at 23–24.

the plaintiff's claim is for a sum certain or a sum that can be made certain by computation, the clerk—on the plaintiff's request, with an affidavit showing the amount due—must enter judgment for that amount and costs against a defendant who has been defaulted for not appearing[.]" Fed. R. Civ. P. 55(b)(1). "In all other cases, the party must apply to the court for a default judgment." Fed. R. Civ. P. 55(b)(2).

"[A] court can enter a default judgment against a defendant who never appears or answers a complaint, for in such circumstances the case never has been placed at issue." *Solaroll Shade & Shutter Corp. v. Bio–Energy Sys., Inc.*, 803 F.2d 1130, 1134 (11th Cir. 1986). A court also can enter default judgment against a defendant who answers the complaint but fails to appear at a pretrial conference, fails to comply with court orders, or fails to comply with procedural rules. *McGrady v. D'Andrea Elec., Inc.*, 434 F.2d 1000, 1001 (5th Cir. 1970); *Flaksa v. Little River Marine Constr. Co.*, 389 F.2d 885, 887 (5th Cir. 1968). But "a defendant's default does not in itself warrant … a default judgment." *Nishimatsu Constr. Co. v. Hous. Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975). By defaulting, the defendant admits only the plaintiff's well-pleaded factual allegations, and those allegations must provide a "sufficient basis" for the judgment. *Id.*

Here, at the Court's direction, D24, D27, the clerk entered default against Pinkcoboutique, D26, after Pinkcoboutique failed to appear or respond to the complaint, and against Qu'Knhiya Hill, D28, after she answered the complaint but failed to participate in the case management conference, *see* D21 at 1, failed to respond to communications from Chrome Hearts' counsel, *see* D23 at 2, failed to respond to the order permitting her to respond to Chrome Hearts' status report if she wished "to be heard," *see* D22 at 3, and failed to

16

respond to the order directing her to advise the Court whether she intends to defend the lawsuit, *see* D24 ¶2. Under these circumstances, default against Pinkcoboutique and Qu'Knhiya Hill was warranted, *see* Fed. R. Civ. P. 55(a); *McGrady*, 434 F.2d at 1001, and default judgment against them is warranted if Chrome Hearts' well-pleaded factual allegations provide a sufficient basis for liability under any of the four claims for relief (trademark counterfeiting and infringement under § 32 of the Lanham Act, D1 ¶¶31–42; false designation of origin and false descriptions under § 43(a) the Lanham Act, D1 ¶¶43–48; trademark infringement under Florida common law, D1 ¶¶49–58; or unfair competition under Florida common law, D1 ¶¶59–68), *see Nishimatsu*, 515 F.2d at 1206.

"Trademark protection has roots in common law and equity." *U.S. Pat. & Trademark Off. v. Booking.com B.V.*, 140 S. Ct. 2298, 2302 (2020). "Today, the Lanham Act, enacted in 1946, provides federal statutory protection for trademarks." *Id.* Congress enacted the Lanham Act "to regulate commerce … by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by State …; to protect persons engaged in such commerce against unfair competition; [and] to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks[.]" 15 U.S.C. § 1127.

Under the Lanham Act, a "trademark includes "any word, name, symbol, or device, or any combination thereof … used by a person … to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." *Id.* Under that definition, a mark is not a mark

"unless it identifies a product's source … and distinguishes that source from others." *Jack Daniel's Props., Inc. v. VIP Prods. LLC*, 599 U.S. 140, 146 (2023). By informing the public about who is responsible for a good or service, a mark benefits both "consumers and producers." *Id.* The mark "enables customers to select the goods and services that they wish to purchase" and "those they want to avoid." *Id.* (internal quotation marks and quoted authority omitted).

The owner of a trademark may request registration of the mark. 15 U.S.C. § 1051. Registration is unavailable for some marks. *Id.* § 1052. For example, registration is unavailable for a mark that "so resembles" another mark that the resemblance will likely "cause confusion," *id.* § 1052(d), or for a mark that is "merely descriptive" of the goods on which it is used, *id.* § 1052(e).

Registration comes with benefits. *Jack Daniel's*, 599 U.S. at 146. Registration serves as "constructive notice of the registrant's claim of ownership thereof." 15 U.S.C. § 1072. Registration also serves as "prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration subject to any conditions or limitations stated therein[.]" *Id.* § 1115(a). The prima facie evidence does not preclude someone from proving a defense or defect that can be asserted against an unregistered mark. *Id.* For example, a non-registrant may rebut a prima facie assumption of validity by showing prior use. *See Coach House Rest., Inc. v. Coach & Six Rests., Inc.*, 934 F.2d 1551, 1558 (11th Cir. 1991).

A "counterfeit mark" means "a counterfeit of a mark that is registered on the principal register … for such goods or services sold, offered for sale, or distributed and that is in use, whether or not the person against whom relief

is sought knew such mark was so registered; or … a spurious designation that is identical with, or substantially indistinguishable from, a designation as to which the remedies of this chapter are made available …" but "does not include any mark or designation used on or in connection with goods or services of which the manufacture or producer was, at the time of the manufacture or production in question authorized to use the mark or designation for the type of goods or services so manufactured or produced, by the holder of the right to use such mark or designation." 15 U.S.C. § 1116(d).

Under § 32 of the Lanham Act (the first claim for relief here, D1 ¶¶ 31–42), a person is liable for infringement of a registered trademark if the person, without the registrant's consent, uses "in commerce any reproduction, counterfeit, copy, or colorable imitation of [the] registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive"; or "reproduce[s], counterfeit[s], cop[ies], or colorably imitate[s] a registered mark and appl[ies] such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive[.]" *Id.* § 1114(1). "For a trademark infringement claim, a plaintiff must demonstrate (1) that it owns a valid mark with priority, and (2) that the defendant's mark is likely to cause consumer confusion with the plaintiff's mark." *FCOA LLC v. Foremost Title & Escrow Servs. LLC*, 57 F.4th 939, 946 (11th Cir.), *cert. denied*, 144 S. Ct. 103 (2023).

Under § 43(a) of the Lanham Act (the second claim for relief here, D1 ¶¶43–48), a person is liable for false designation of origin or false descriptions if the person, "on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact" that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person," or "in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities[.]" 15 U.S.C. § 1125(a). Section 43(a) "creates two distinct bases of liability: false association and false advertising[.]" *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 122 (2014) (internal citations omitted). "To establish a prima facie case under § [43(a)], a plaintiff must show (1) that the plaintiff had enforceable trademark rights in the mark or name, and (2) that the defendant made unauthorized use of it 'such that consumers were likely to confuse the two.'" *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 647 (11th Cir. 2007) (quoted authority omitted).

"In the typical case" under § 32 or § 43(a), "the owner of a mark sues someone using a mark that closely resembles its own" and "[t]he court must decide whether the defendant's use is 'likely to cause confusion, or to cause mistake, or to deceive.'" *Jack Daniel's*, 599 U.S. at 147 (quoting 15 U.S.C. §§ 1114(1)(a) & 1125(a)(1)(A)). "The keystone in that statutory standard is likelihood of confusion." *Id.* (internal quotation marks and quoted authority omitted). "And the single type of confusion most commonly in trademark law's

20

sights is confusion about the source of a product or service." *Id.* (internal quotation marks and quoted authority omitted). "Confusion as to source is the bête noire of trademark law—the thing that stands directly opposed to the law's twin goals of facilitating consumers' choice and protecting producers' good will." *Id.*

A finding of actual confusion is "obviously not a prerequisite to a finding of likelihood of confusion." *Wreal, LLC v. Amazon.com, Inc.*, 38 F.4th 114, 137 (11th Cir. 2022). "The likelihood of confusion analysis involves two steps." *FCOA*, 57 F.4th at 947. "At step one, the court considers [seven] factors which can provide circumstantial evidence of likelihood of confusion." *Id.* "At step two, the court weighs each of the relevant circumstantial facts—independently and then together—to determine whether the ultimate fact, likelihood of confusion, can reasonably be inferred." *Id.* The analysis for Florida common law claims of trademark infringement and unfair competition (the third and fourth claims for relief here, D1 ¶¶49–68) is the same. *Gift of Learning Found., Inc. v. TGC, Inc.*, 329 F.3d 792, 802 (11th Cir. 2003); *Anderson v. Upper Keys Bus. Grp., Inc.*, 61 So. 3d 1162, 1167 (Fla. 3d DCA 2011).

The seven factors are: "(1) the strength of the allegedly infringed mark;[5]

---

[5]For the first factor, assessing the strength of the allegedly infringed mark requires (1) classifying the mark as "generic," "descriptive," "suggestive," or "arbitrary" "based on the relationship between the mark and the service or good it describes" and (2) considering "the degree to which third parties make use of the mark." *Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1256–57 (11th Cir. 2016) (quoted authority omitted). "Generic marks are the weakest and are not entitled to protection—they refer to a class of which an individual product is a member (for example, 'liquor store' used in connection with the sale of liquor)." *Id.* at 1256. "Descriptive marks describe a characteristic or quality of an article or service (for example, 'vision center' denoting a place where glasses are sold)." *Id.* "Suggestive marks suggest characteristics of the goods and services and require imaginative effort by the consumer in order to be understood as descriptive (such as 'penguin' being applied to refrigerators)." *Id.* "Finally, arbitrary

(2) the similarity of the infringed and infringing marks;[6] (3) the similarity of the goods and services the marks represent;[7] (4) the similarity of the parties' trade channels and customers;[8] (5) the similarity of advertising media used by the parties;[9] (6) the intent of the alleged infringer to misappropriate the proprietor's good will;[10] and (7) the existence and extent of actual confusion in the consuming public." *FCOA*, 57 F.4th at 947. The Eleventh Circuit also "analyze[s] consumer sophistication as a separate factor or circumstantial fact relevant to determining likelihood of confusion[.]"[11] *Id.*

---

marks—the strongest of the four categories—bear no relationship to the product (e.g., 'Sun Bank' is arbitrary when applied to banking services)." *Id.* at 1256–57.

[6]For the second factor, assessing the similarity of the infringed and infringing marks is determined by "the overall impression created by the marks, including a comparison of the appearance, sound and meaning of the marks, as well as the manner in which they are displayed." *Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC*, 605 F.3d 931, 939 (11th Cir. 2010) (quoted authority omitted).

[7]For the third factor, assessing the similarity of the goods and services the marks represent "requires a determination as to whether the products are the kind that the public attributes to a single source, not whether ... the purchasing public can readily distinguish between the products of the respective parties." *Id.* at 939–40 (quoted authority omitted).

[8]For the fourth factor, assessing the similarity of the parties' trade channels and customers "takes into consideration where, how, and to whom the parties' products are sold." *Id.* at 940 (quoted authority omitted).

[9]For the fifth factor, assessing the similarity of advertising media "looks to each party's method of advertising." *Id.* (quoted authority omitted).

[10]For the sixth factor, a court "must determine whether the defendant adopted a plaintiff's mark with the intention of deriving a benefit from the plaintiff's business reputation." *Id.* (internal quotation marks omitted).

[11]The Eleventh Circuit recognizes that confusion can arise "when potential purchasers of the trademark holder's products would be likely to be confused should they encounter the allegedly counterfeit goods in a post-sale context—for example, in a direct purchaser's possession." *United States v. Torkington*, 812 F.2d 1347, 1352 (11th Cir. 1987); *accord Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1295 (11th Cir. 2018). In the complaint, Chrome Hearts alleges, "Upon information and belief, Accused Products that Defendants sold and shipped to this district are very likely [to] cause confusion for consumers in this district, including Plaintiff's customers, who, at the

"In drawing the ultimate inference about likelihood of confusion, the two most important circumstantial facts are respectively actual confusion and the strength of the mark." *Id.* Moreover, where "a plaintiff can show that a defendant adopted a mark with the intent of deriving benefit from the reputation of the plaintiff, that fact alone 'may be sufficient to justify the inference that there is confusing similarity.'" *Exxon Corp. v. Tex. Motor Exch. of Hous., Inc.*, 628 F.2d 500, 506 (5th Cir. 1980); *see also Babbit Elecs., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1179 (11th Cir. 1994) ("In fact, a likelihood of confusion can be found as a matter of law if the defendant intended to derive benefit from the plaintiff's trademark.").[12]

At the Court's direction, D24, D27, the clerk entered default against Pinkcoboutique, D26, after Pinkcoboutique failed to appear, and against

---

[12] time of initial interest, sale, and in the post-sale setting are led to believe that the Accused Products are genuine goods originating from, associated with, and/or approved by Chrome Hearts." D1 ¶29. In the motion, Chrome Hearts argues, "Defendants' illegal use of the Chrome Hearts [m]arks is likely to cause confusion for consumers, especially in the post-sale setting, such that consumers mistakenly believe that the Accused Products are genuine goods originating from, associated with, and/or approved by Chrome Hearts." D31 at 7. Considering the allegations and arguments, analyzing post-sale confusion as distinct from pre-sale or point-of-sale confusion is unnecessary.

[12]Chrome Hearts cites non-binding authority holding that, if a defendant has used a counterfeit mark, the court may forego analysis of the factors and presume the likelihood of confusion. D31 at 12 (citing *Casa Dimitri Corp. v. Invicta Watch Co. of Am., Inc.*, 270 F. Supp. 3d 1340, 1359 (S.D. Fla. 2017); *see also, e.g., Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 148 (4th Cir. 1987) ("Where, as here, one produces counterfeit goods in an apparent attempt to capitalize upon the popularity of, and demand for, another's product, there is a presumption of a likelihood of confusion."); *Dive N' Surf, Inc. v. Anselowitz*, 834 F. Supp. 379, 382 (M.D. Fla. 1993) ("[B]ecause the counterfeit symbols and the genuine symbols are substantially similar as to both design and use and because defendant sold the counterfeit symbols to the public, the court presumes that defendant's counterfeit items caused public confusion in the marketplace."). Without statutory authority or binding precedent on a presumption of confusion, the undersigned declines to apply one here. *See Platinum Props. Inv. Network, Inc. v. Sells*, No. 18-61907-CIV, 2021 WL 4429067, at *7 (S.D. Fla. Feb. 9, 2021) (declining to apply a presumption and analyzing the factors considering the absence of binding precedent).

Qu'Knhiya Hill, D28, after she answered but failed to participate in the case management conference, *see* D21, failed to respond to communications from Chrome Hearts' counsel, *see* D23, and failed to respond to the order directing her to advise the Court whether she intends to defend this lawsuit, *see* D24 ¶2.

Here, through default, the defendants admit Chrome Hearts' well-pleaded factual allegations, and those allegations provide a "sufficient basis" for default judgment.[13] *See Nishimatsu*, 515 F.2d at 1206 (quoted).

Chrome Hearts owns the CHROME HEARTS word mark, design-only marks, and composite trademarks, including twelve marks registered with the United States Patent and Trademark Office. *See* D1 ¶18. The defendants are marketing and selling the Accused Products, *see* D1 ¶¶23, 24, and have not appeared to contest the validity of the registered marks, Chrome Heart's ownership of the marks, or Chrome Heart's exclusive right to use the registered marks in commerce on or in connection with the goods or services specified in the registrations, *see* 15 U.S.C. § 1115(a). Assessing the likelihood of confusion, on the first factor (the strength of the allegedly infringed mark), the Chrome Hearts marks are at least suggestive (suggesting characteristics of the clothing and other goods and requiring imaginative effort by the consumer to be

---

[13]Chrome Hearts makes many allegations on "information and belief." D1 ¶¶6–9; 24–27, 29–30, 39. In the default-judgment context, some courts have refused to consider "on information and belief" allegations if the allegations are too vague. *See, e.g., Wagner v. Giniya Int'l Corp.*, No. 6:20-cv-1217-ACC-DCI, 2020 WL 7774385, at *3 (M.D. Fla. Dec. 3, 2020), *report and recommendation adopted*, 2020 WL 7768949 (M.D. Fla. Dec. 30, 2020). Other courts have considered "on information and belief" paragraphs if the paragraphs state facts primarily within the defendant's knowledge. *See, e.g., Exact Invs. LLC v. Vesnaverboth*, No. CV 17-6109, 2022 WL 17782087, at *3 (E.D.N.Y. July 18, 2022) (citing cases). Here, consideration of the "on information and belief" allegations in Chrome Hearts' complaint is warranted. The allegations are not vague and are of facts within the defendants' knowledge, and excluding their consideration would unfairly penalize Chrome Hearts for the defendants' failure to participate in discovery.

understood as descriptive) and probably arbitrary (having no relationship with the clothing and other goods) and are on goods used by consumers worldwide, including by famous entertainers. *See* D1 ¶14; *see also Chrome Hearts LLC v. Controse Inc.*, No. 21-CV-6858, 2023 WL 5049198, at *16–17 (S.D.N.Y. Aug. 8, 2023) (ruling, after extensive analysis, that the first factor favors Chrome Hearts for certain Chrome Hearts marks). On the second factor (the similarity of the infringed and infringing marks), the marks are substantially similar if not identical, as shown by these examples from images in the complaint:



| Registered Marks | Accused Products |
|---|---|

*See* D1 ¶¶18, 23. On the third factor (the similarity of the goods the marks represent), the goods the marks represent are the same: clothing. *See* D1 ¶¶13, 16, 19, 23, 24. On the fourth factor (the similarity of the parties' trade channels and customers), both sides sell clothing through a website, including in the Middle District of Florida. *See* D1 ¶¶12, 24. On the fifth factor (the similarity of advertising media used by the parties), Chrome Hearts alleges the

defendants promote and market the Accused Products through their website and Instagram accounts. *See* D1 ¶24. While Chrome Hearts alleges it sells products through its website, www.chromehearts.com, *see* D1¶12, and devotes substantial time, effort, and money to advertising, promoting, and marketing its products, *see* D1 ¶¶19, 20–21, 22, Chrome Hearts does not specifically allege online marketing and advertising, *see generally* D1. On the sixth factor (the intent of the alleged infringer to misappropriate the proprietor's good will), the defendants intended to misappropriate Chrome Hearts' good will as evidenced by Chrome Hearts' well-known name and the defendants' use of replicas or near replicas of the Chrome Hearts' marks. *See* D1 ¶14, 15, 19, 22–23. On the seventh factor (the existence and extent of actual confusion in the consuming public), Chrome Hearts does not allege actual confusion in the consuming public. *See generally* D1. On the additional factor (consumer sophistication), most direct purchasers of high-end clothing (and observers of direct-purchasers of high-end clothing) are sophisticated. Considering these factors (step one) and weighing these factors individually and together (step two), they provide circumstantial evidence of likelihood of confusion, with most factors— including intent—supporting or strongly supporting a likelihood of confusion.

In short, Chrome Hearts' well-pleaded factual allegations establish Chrome Hearts' ownership and use of registered marks, the defendants' marketing and sale of the Accused Products using replicas or near replicas of the registered marks, and the likelihood of confusion. The allegations thus provide a "sufficient basis" for default judgment on the claims. *See Nishimatsu*, 515 F.2d at 1206 (quoted).

**B.    Damages**

Providing a chart with information supported by counsel's declaration, Chrome Hearts contends, "Based on the varying products and marks on the Accused Products, [the d]efendants are liable for up to $2,200,000 in statutory damages for non-willful infringement, and up to $22 million for willful infringement":

| Accused Products by Category | Approx. Marks Per Item Based on Info Available | Min. Damages for Non-Willful Infringement | Max. Damages for Non-Willful Infringement | Max. Damages for Willful Infringement |
|---|---|---|---|---|
| Dress | 3 | $3,000 | $600,000 | $6,000,000 |
| Bra Top | 1 | $1,000 | $200,000 | $2,000,000 |
| Pants | 2 | $2,000 | $400,000 | $4,000,000 |
| Shorts | 1 | $1,000 | $200,000 | $2,000,000 |
| Jacket | 1 | $1,000 | $200,000 | $2,000,000 |
| Shirt | 2 | $2,000 | $400,000 | $4,000,000 |
| Corset | 1 | $1,000 | $200,000 | $2,000,000 |
| **Total** | **11** | **$11,000** | **$2,200,000** | **$22,000,000** |

D31 at 14–15; D31-1 ¶3.

Chrome Hearts requests $100,000 in statutory damages for counterfeiting, an amount Chrome Hearts claims is "*significantly less than one percent* of the recoverable damages (.0045%)." D31 at 18. As stated, Chrome Hearts demanded statutory damages in the complaint. *See* D1 at ¶69(F).

Once liability is established through default, the court must ensure "there is a legitimate basis for any damage award it enters[.]" *Anheuser Busch, Inc. v. Philpot*, 317 F.3d 1264, 1266 (11th Cir. 2003). "A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c).

27

"The court may conduct hearings or make referrals—preserving any federal statutory right to a jury trial—when, to enter or effectuate [default] judgment, it needs to … determine the amount of damages[.]" Fed. R. Civ. P. 55(b)(2). "It is a familiar practice and an exercise of judicial power for a court upon default, by taking evidence when necessary or by computation from facts of record, to fix the amount which the plaintiff is lawfully entitled to recover and to give judgment accordingly." *Pope v. United States*, 323 U.S. 1, 12 (1944). "An evidentiary hearing is not a *per se* requirement; indeed, Rule 55(b)(2) speaks of evidentiary hearings in a permissive tone." *S.E.C. v. Smyth*, 420 F.3d 1225, 1232 n.13 (11th Cir. 2005). "[N]o [evidentiary] hearing is required where all essential evidence is already of record." *Id.*

Under the Lanham Act, subject to "the principles of equity," a plaintiff who establishes a violation of § 32 or § 43(a) is entitled to the "defendant's profits," "any damages sustained by the plaintiff," and "the costs of the action."[14] 15 U.S.C. § 1117(a); *see also Romag Fasteners, Inc v. Fossil, Inc.*, 140 S. Ct. 1492, 1494–95 (2020). Ordinary "principles of equity" apply. *Romag Fasteners,* 140 S. Ct. at 1495.

In lieu of those damages, where counterfeiting is involved, the Lanham Act allows the owner of a registered mark to elect statutory damages:

> [I]n a case involving the use of a **counterfeit** mark … in connection with the sale, offering for sale, or distribution of goods or services, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits … an award of statutory

---

[14]The Act further specifies that the court "shall assess such profits and damages[.]" 15 U.S.C. § 1117(a); *see Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1359 (11th Cir. 2019) (observing that a court—not a jury—assesses profits).

damages for any such use in connection with the sale, offering for sale, or distribution of goods or services in the amount of—

(1) not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, **as the court considers just**; or

(2) if the court finds that the use of the counterfeit mark was willful, not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, **as the court considers just**.

15 U.S.C. at 1117(c) (emphasis added); *see id*. § 1116(d) (defining a "counterfeit mark" by reference to a "a mark that is registered on the principal register"). In enacting the statutory damages provision, "Congress appears to have been motivated by a gap in the law: Plaintiffs who were victorious on their civil counterfeiting claims were often unable to obtain an adequate recovery in actual damages because counterfeiters often maintain sparse business records, if any at all." *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 110 (2d Cir. 2012).

Through the Lanham Act, "Congress meticulously detailed the remedies available to a plaintiff who proves that his valid trademark has been infringed." *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 719 (1967). In deciding relief, the Act "vests considerable discretion in the district court." *Burger King Corp. v. Mason*, 710 F.2d 1480, 1495 (11th Cir. 1983). In the exercise of that "broad discretion," the court must "fashion the assessment of damages" based on "the circumstances of the case"; "it is the character of the conduct surrounding the infringement that is relevant." *Burger King Corp. v. Mason*, 855 F.2d 779, 782 (11th Cir. 1988); *see also* 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 30:95 (5th ed. 2023) (observing that, by use of the phrase, "as considered just,"

Congress gave courts "considerable discretion" in determining the amount of statutory damages).

The Copyright Act also permits statutory damages for infringement "as the court considers just." *See* 17 U.S.C. § 504(c)(1) (quoted). For statutory damages under the Copyright Act, courts have considered factors that include the infringer's state of mind, the expenses saved by the infringer, the profits earned by the infringer, the revenue lost by the copyright holder, the deterrent effect on the infringer and others, the infringer's cooperation in providing evidence on the value of the infringing material, and the parties' conduct and attitude. *Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 127 (2d Cir. 2014); *see also Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 852 (11th Cir. 1990) (holding that, to deter copyright infringement and vindicate rights, a court may consider attitude and conduct); *Douglas v. Cunningham*, 294 U.S. 207, 210 (1935) (observing that the "employment of the statutory yardstick, within set limits [in the Copyright Act], is committed solely to the court which hears the case, and this fact takes the matter out of the ordinary rule with respect to abuse of discretion."); *L.A. Westermann Co. v. Dispatch Printing Co.*, 249 U.S. 100, 106–07 (1919) ("[T]he court's conception of what is just in the particular case, considering the nature of the copyright, the circumstances of the infringement and the like, is made the measure of the damages to be paid, but with the express qualification that in every case the assessment must be within the prescribed limitations, that is to say, neither more than the maximum nor less than the minimum. Within these limitations the court's discretion and sense of justice are controlling, but it has no discretion when proceeding under this provision to go outside of them.").

Chrome Hearts bases its request for a statutory award of $100,000 on

five considerations. D31 at 14–18. First, as supported by counsel's declaration, the defendants represented during the earlier litigation that they had made approximately $1,700 in revenue, but the records they provided are for between July and December 2021, the amount does not account for any continued infringement discovered in March and December 2022, and their failure to participate in the action has deprived Chrome Hearts of discovery on profits. *See* D31-1 ¶¶4, 5, 9. Second, as supported by well-pleaded allegations in the complaint, the Chrome Hearts marks are "highly valuable" as evidenced by Chrome Hearts' substantial advertising efforts and significant sales, as well as the marks' long-term use and widespread acceptance and recognition among the consuming public and trade throughout the United States. *See* D1 ¶¶10–23. Third, specific deterrence is necessary; as supported by counsel's declaration, although the defendants have had notice of infringement through the actions in both California and here, "they do not appear to understand the gravity of their actions" and continue to sell the Accused Products, "going so far as to cross out the marks at issue then re-offer the products for sale." D31 at 17; D31-1 ¶¶5, 9. Fourth, general deterrence is necessary; Chrome Hearts "has often been the target of trademark infringement due to its notoriety." D31 at 18. Fifth, as supported by the well-pleaded factual allegations in the complaint, reasonable inferences drawn from them, and counsel's declaration, the defendants are acting intentionally, even after notice. D1 ¶¶30, 39, 53, 55, 62, 64; D31-1 ¶¶5, 9.

Considering these circumstances, especially specific and general deterrence and the number of Accused Products bearing one or more counterfeit Chrome Hearts marks (seven), $100,000 is just. *See, e.g.*, *Chrome Hearts LLC v. Proxy Puppet Inc.*, No. CV 23-263, 2023 WL 4157468, at *4 (C.D. Cal. May 12, 2023) ("Chrome Hearts could seek up to $2 million in damages

per counterfeit mark, or $6 million. … Instead, Chrome Hearts seeks a reasonable sum of $300,000, which is only 5% of the maximum statutory award. … Proxy Puppet's refusal to defend in this action prevents Chrome Hearts from determining its actual damages. Accordingly, Chrome Hearts has shown it is entitled to a statutory damages award of $300,000 due to Proxy Puppet's willful infringements."); *Chrome Hearts LLC v. Urb. Survival Gear USA*, No. EDCV 21-1777, 2023 WL 6785795, at *5 (C.D. Cal. Aug. 31, 2023) ("Plaintiff has only provided evidence of one sale of an infringing mark by Defendants. … The Court finds that a statutory award of $10,000, along with the injunctive relief …, is sufficient to compensate Plaintiff and to deter Defendants and others from engaging in similar behavior. Thus, the Court GRANTS statutory damages but reduces the amount to $10,000." (emphasis omitted)).[15]

---

[15]For statutory damages under the Copyright Act, the Supreme Court has held the Seventh Amendment—but not the Act—provides a right to jury trial on all issues pertinent to the award, including on the amount itself. *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 355 (1998). "[B]y analogy …, a jury can determine the amount of statutory damages for trademark counterfeiting." 5 McCarthy § 30:95; *see also* 11th Cir. Pattern Jury Instrs., Civil Cases, § 10.6 (rev'd Mar. 2022) (instructions for assessing statutory damages under the Lanham Act).

A "proper" demand for a jury trial "may be withdrawn only if the parties consent." Fed. R. Civ. P. 38(d); *see also* Fed. R. Civ. P. 38(a) ("The right of trial by jury as declared by the Seventh Amendment to the Constitution—or as provided by a federal statute—is preserved to the parties inviolate."); Fed. R. Civ. P. 39(a) ("When a jury trial has been demanded under Rule 38, the action must be designated on the docket as a jury action. The trial on all issues so demanded must be by jury unless: (1) the parties or their attorneys file a stipulation to a nonjury trial or so stipulate on the record; or (2) the court, on motion or on its own, finds that on some or all of those issues there is no federal right to a jury trial.").

Here, the Seventh Amendment provides a right to a jury trial, *see Feltner*, 523 U.S. at 355; and Chrome Hearts timely demanded a jury trial, *see* D1 at 25; but in the motion asks the Court to enter default judgment for $100,000 without providing its own or the defendants' consent to withdraw the demand, *see generally* D31.

## C.    Injunction

Chrome Hearts requests a permanent injunction "against [the d]efendants and their officers, agents, servants, employees, and any persons in active concert or participation with them, permanently restraining and

---

Consent is unnecessary. For damages in a default judgment, Rule 55(b)(2) requires preservation of "any federal statutory right to a jury trial." *See* Fed. R. Civ. P. 55(b)(2) (quoted). With reference to 28 U.S.C. § 785 ("Action to recover forfeiture in bond), on which 28 U.S.C. § 1874 ("Actions on bonds and specialties") is based, advisory committee notes make clear preservation of a right to a jury trial is required only when a statute like § 1874 provides that the right to a jury trial survives default. *See* 1937 Adv. Comm. Note to Rule 55 ("[§785] and similar statutes are preserved by the last clause of paragraph (2)."); Fed. R. Civ. P. 55(b)(2) (1938) ("If, in order to enable the court to enter judgment …, it is necessary to take an account or to determine the amount of damages …, the court may conduct such hearings or order such references as it deems necessary and proper and shall accord a right of trial by jury to the parties when and as required by any statute of the United States."); *see also, e.g., Sells v. Berry*, 24 F. App'x 568, 572 (7th Cir. 2001) ("In the case of a default, only … § 1874 may guarantee a right to a jury trial[.]"); *Benz v. Skiba, Skiba & Glomski*, 164 F.R.D. 115, 115–16 (D. Me. 1995) (holding that although Title VII includes a right to jury trial, when liability is established by default, there is no entitlement to a jury trial on damages because the provision preserving a right to a jury trial pertains "to statutes requiring jury trials specifically after default has occurred"); *Frankart Distribs., Inc. v. Levitz*, 796 F. Supp. 75, 76 (E.D.N.Y. 1992) ("By referring to a right to a jury trial as required by 'any statute,' Rule 55 presupposes that a default judgment extinguishes the constitutional right to a jury trial.").

A former Fifth Circuit case holding a jury must determine an issue of fact on damages unless the parties, including a defaulting party, waive a jury determination in writing, *Thorpe v. Nat'l City Bank of Tampa*, 274 F. 200, 202 (5th Cir. 1921), is not binding because it precedes the Federal Rules of Civil Procedure. *See Matter of Dierschke*, 975 F.2d 181, 185 (5th Cir. 1992) ("It is also 'clear ... that in a default case neither the plaintiff nor the defendant has a constitutional right to a jury trial on the issue of damages.'" (quoting 5 Moore's Federal Practice § 38.19[3] (1992)). A former Fifth Circuit case post-dating the rules expresses the same principle but only in non-binding dictum. *See Bass v. Hoagland*, 172 F.2d 205, 206–11 (5th Cir. 1949) (holding a district court improperly entered default judgment under circumstances amounting to a due-process deprivation, including by awarding damages without a jury "as required by Rules 38 and 55(b)(2)"). Other contrary authority is not persuasive because it fails to analyze or persuasively analyze the "any federal statutory right to a jury trial" phrase in Rule 55(b)(2). *See, e.g., Zero Down Supply Chain Sols., Inc. v. Glob. Transp. Sols., Inc.*, 282 F.R.D. 604, 605–06 (D. Utah 2012); *Mitchell v. Bd. of Cnty. Comm's of Santa Fe*, No. CIV 05-1155, 2007 WL 2219420, at *13 (D.N.M. May 9, 2007).

enjoining them from further infringement of the Chrome Hearts [m]arks and from unfairly competing with [Chrome Hearts], either directly or contributorily in any manner." D31 at 1, 21. Chrome Hearts does not include proposed language in the motion, *see generally* D31, but included language in the demand in the complaint, *see* D1 at 22–23.

Besides monetary damages, the Lanham Act gives a court the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any [trademark] right… or to prevent a violation under" § 43(a). 15 U.S.C. § 1116(a); *accord Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1352–53 (11th Cir. 2019).

To obtain a permanent injunction, a plaintiff must show: (1) "it has suffered an irreparable injury"; (2) "remedies available at law, such as monetary damages, are inadequate to compensate for that injury"; (3) "considering the balance of the hardships between the plaintiff and defendant, a remedy in equity is warranted"; and (4) "the public interest would not be disserved by a permanent injunction." *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1208 (11th Cir. 2008). If granted, a court must "ensure that the scope of the awarded relief does not exceed the identified harm." *Thomas v. Bryant*, 614 F.3d 1288, 1317–18 (11th Cir. 2010).

"[I]n ordinary trademark infringement actions[,] complete injunctions against the infringing party are the order of the day." *Angel Flight of Ga.*, 522 F.3d at 1209 (alteration omitted). "The reason is simple: the public deserves not to be led astray by the use of inevitably confusing marks[.]" *Id.*

34

"Every order granting an injunction ... must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1). The "clear purpose" of these requirements is to avoid "injunctions which do not set out fairly for the benefit of the enjoined party what conduct is forbidden." *Sheila's Shine Prods., Inc. v. Sheila Shine, Inc.*, 486 F.2d 114, 129 (5th Cir. 1973). "An injunction is overly broad [if it] leaves parties open to the hazard of conducting business in the mistaken belief that it is not prohibited by the injunction and later finding themselves subject to punishment for contempt." *Id.* (internal quotation marks omitted). An injunction that "merely forbids a defendant from performing acts of unfair competition, or from infringing on a plaintiff's trademarks and trade secrets adds nothing to what the law already requires." *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1203 (11th Cir. 2001) (internal quotation marks, quoted authority, and emphasis omitted).

This Court has entered injunctions in infringement cases decided by default. *See, e.g., Fuzion Vapor, LLC v. Fumizer, LLC*, No. 3:16-cv-942-MMH-PBD, 2017 WL 3725677, at *2 (M.D. Fla. Aug. 30, 2017) (enjoining the defendant from using specified marks "in advertising, promoting, merchandising, distributing, offering for sale, and selling electronic-cigarette products and services and any products or services relating to electronic cigarettes or their use; expressly or impliedly representing to customers, potential customers, or the public that any electronic-cigarette products and services or other products or services related to electronic cigarettes or their use are affiliated in any way with" the plaintiff; "representing by words or conduct that" the defendant's "electronic-cigarette products and services or any products or services relating to electronic cigarettes or their use, are authorized

by, sponsored by, endorsed by, or otherwise connected with" the plaintiff; and "doing any other acts calculated or likely to cause confusion or mistake in the mind of the public or lead consumers into the belief that" the defendant's "electronic-cigarette products and services and any other products or services relating to electronic cigarettes or their use are authorized, sponsored, licensed, endorsed, or promoted by" the plaintiff "or are otherwise affiliated or connected with" the plaintiff); *Ultratech Int'l, Inc. v. Res. Energy Grp., LLC*, No. 3:14-cv-12-MMH-JBT, 2015 WL 1911322, at *1–2 (M.D. Fla. Apr. 27, 2015) (enjoining defendants "and their principals, agents, servants, employees, officers, attorneys, successors and assigns, and all persons, entities, firms, and corporations acting in privity, concert, or participation with them … from representing that any products, merchandise or goods manufactured, distributed, sold, held for sale, or advertised" by the defendant "are sponsored, authorized by or related to" the plaintiff; "engaging in any conduct that tends to falsely represent, or is likely to confuse, mislead, or deceive members of the purchasing public to believe that" the defendant "and any products sold or marketed for sale by" the defendant "are in some way connected, affiliated, sponsored, approved, or licensed by" the plaintiff; and "interfering with" the plaintiff's "rights in, or use of specified marks or damaging" the plaintiff's "business, reputation or goodwill").

Here, Chrome Hearts is entitled to an injunction against the defendants. On the first element (irreparable injury), by defaulting, the defendants admit they continue to use the infringing marks to market and sell the Accused Products in Florida and they adopted the infringing marks intending to trade on Chrome Heart's intellectual property and lead consumers to believe its products are associated with Chrome Hearts. D1 ¶¶23–26, 29–30. The admitted allegations establish the infringing marks are likely to cause consumer

confusion, D1 ¶29–30, and Chrome Hearts has presented information that the defendants have ignored efforts to resolve the dispute and have continued to use the infringing marks, *see* D23 at 1–2, 17. The defendants' continued use of infringing marks means, absent an injunction, Chrome Hearts will continue to be irreparably injured by a lack of control over its reputation.

On the second element (no adequate remedy at law), the defendants' continued use of the infringing marks inhibits Chrome Hearts' ability to control its reputation, and damages are inadequate to compensate for that harm.

On the third element (balance of hardships), because infringing is unlawful, a defendant suffers no cognizable hardship if prohibited from infringing on a plaintiff's marks. *Crossfit, Inc. v. Quinnie*, 232 F. Supp. 3d 1295, 1317 (N.D. Ga. 2017); *Edge Sys.*, 186 F. Supp. 3d at 1362–63; *Venus Fashion, Inc. v. Tidebuy Int'l, Ltd.*, No. 3:14-cv-191-MMH-JBT, 2015 WL 5915961, at *7 (M.D. Fla. Oct. 8, 2015). Any injury a "defendant might suffer if an injunction were imposed may be discounted by the fact that the defendant brought that injury upon itself." *Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharms. Co.*, 290 F.3d 578, 596 (3d Cir. 2002) (quoted). The balance of hardships favors Chrome Hearts.

On the fourth element (the public interest), "the public deserves not to be led astray by the use of inevitably confusing marks[.]" *Angel Flight of Ga.*, 522 F.3d at 1209. The public's interest in not being misled by confusingly similar marks outweighs any potential harm to competition, which the defendants can mitigate by adopting a sufficiently distinct brand.

Chrome Hearts is entitled to a permanent injunction. Although the motion fails to include sufficiently specific information, the complaint does.

## D.    Notice

Chrome Hearts served the motion for default judgment on all three defendants by email at the same email address provided in Qu'Knhiya Hill's answer, qhillk@yahoo.com, and by U.S. Mail at a residential address, 4829 Playschool Dr., Jacksonville, FL 32210. D31 at 22–23. Chrome Hearts used that residential address (except with an incorrect zip code of 32220) for the summons to Qu'Knhiya Hill, D17 at 1, but served her at a business address, 6316 San Juan Ave., #25-A, Jacksonville, FL 32210, D17 at 2.

"If the party against whom a default judgment is sought has appeared personally or by a representative, that party or its representative must be served with written notice of the application at least 7 days before the hearing." Fed. R. Civ. P. 55(b)(2).

Qu'Knhiya Hill appeared by answering the complaint through her letter. D18. This report and recommendation will be sent to all three defendants by email and U.S. mail at the email address, the residential address, and the business address. The fourteen-day period to object to this report and recommendation will satisfy the notice period required for Qu'Knhiya Hill.

## E.    Servicemembers Civil Relief Act

Because Qu'Knhiya Hill is an individual, D1 ¶7, the undersigned addresses the Servicemembers Civil Relief Act, codified at 50 U.S.C. §§ 3931–3938a.

Under the Act, for any civil action "in which the defendant does not make an appearance," the court, "before entering judgment for the plaintiff," must "require the plaintiff to file with the court an affidavit—(A) stating whether or not the defendant is in military service and showing necessary facts to support the affidavit; or (B) if the plaintiff is unable to determine whether or not the defendant is in military service, stating that the plaintiff is unable to determine whether or not the defendant is in military service." 50 U.S.C. § 3931(b)(1).

Because Qu'Knhiya Hill appeared in the case by answering the complaint through her letter, D18, the requirements in the Act do not apply here. *See id.* § 3931(a) (imposing requirements for a civil action "in which the defendant does not make an appearance"). In any event, the process server's affidavit satisfies the requirements. *See* D17 at 2. The process server states, "At the time of service, [I] asked [Qu'Knhiya Hill] whether she is in active military service for the United States … or for any state in the United States in any capacity whatever or dependent upon a person in active military service and received a negative reply." D17 at 2. The process server effectively states Qu'Knhiya Hill is not in the military and provides the facts facts necessary to support the statement.

## IV.   Recommendations

The undersigned recommends entering an order:

(1)   **granting** the motion for default judgment as to Pinkcoboutique, LLC, and Qu'Knhiya Hill, D31;

(2)   **entering** final default judgment for Chrome Hearts, LLC, and against Pinkcoboutique, LLC, and Qu'Knhiya Hill for $100,000 in statutory damages;

(3)   **entering** a permanent injunction stating it is being entered to prevent Pinkcoboutique, LLC, and Qu'Knhiya Hill from unlawfully infringing on marks owned by Chrome Hearts LLC, and restraining and enjoining Pinkcoboutique, LLC, Qu'Knhiya Hill, and their officers, agents, employees, and lawyers from:

     a. manufacturing, importing, advertising, marketing, promoting, supplying, distributing, offering for sale, or selling any products bearing the Chrome Hearts marks, or any other marks confusingly similar to the Chrome Hearts marks;

     b. engaging in any other activity constituting unfair competition with Chrome Hearts, or acts and practices that deceive consumers, the public, the trade, or all of these categories, including the use of designations and design elements associated with Chrome Hearts; and

     c. committing any other act that falsely represents or has the effect of falsely representing that the goods and services of Pinkcoboutique, LLC, or Qu'Knhiya Hill or both are licensed by, authorized by, offered by, produced by, sponsored by, or in any other way associated with Chrome Hearts; and

(4)   **directing** the clerk to close the case.

## V.   Objections

"Within 14 days after being served with a copy of [a] recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2). "A party may respond to another party's objections within 14 days after being served

with a copy." *Id.* "The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3); *see also* 28 U.S.C. § 636(b)(1)(C) ("A [district judge] shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."). "A party failing to object to … findings or recommendations … in a report and recommendation … waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions[.]" 11th Cir. R. 3-1.

**Entered** in Jacksonville, Florida on February 29, 2024.

PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c:      The Hon. Timothy J. Corrigan

Pinkcoboutique, LLC
6316 San Juan Ave., #25-A
Jacksonville, FL 32210
qhillk@yahoo.com

Pinkcoboutique, LLC
4829 Playschool Dr.
Jacksonville, FL 32210
qhillk@yahoo.com

Qu'Knhiya Hill
6316 San Juan Ave., #25-A
Jacksonville, FL 32210
qhillk@yahoo.com

Qu'Knhiya Hill
4829 Playschool Dr.
Jacksonville, FL 32210
qhillk@yahoo.com

Qu'Aneisha Hill
6316 San Juan Ave., #25-A
Jacksonville, FL 32210
qhillk@yahoo.com

Qu'Aneisha Hill
4829 Playschool Dr.
Jacksonville, FL 32210
qhillk@yahoo.com